**LEE LITIGATION GROUP, PLLC**
Rony Guldmann (RG 5323)
148 West 24th Street, Eighth Floor
New York, NY 10011
Tel.: 212-661-0052
Fax: 212-465-1181
*Attorneys for Plaintiff and the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————

C.K. LEE,
*on behalf of himself and others similarly situated*,

                Plaintiff,                          Case No.:

                                           **CLASS ACTION COMPLAINT**

                v.                              **JURY TRIAL DEMANDED**

MIKIMOTO (AMERICA) CO. LTD.

                Defendant.

———————————————————————

Plaintiff C.K. LEE (herein "Plaintiff Lee" or "Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, brings this Class Action Complaint against Defendant MIKIMOTO (AMERICA) CO. LTD. ("Defendant" or "Mikimoto") and alleges the following:

### NATURE OF THE ACTION

      1.      Throughout human history, pearls have been prized for their beauty, luster, and value. In literature, pearls have been integral as symbols for the purity of love and human aspiration. For example, in *A Raisin in the Sun*, the frustrated African-American protagonist Walter Younger is fed up with racial inequality and proclaims: "Yes, I want to hang some real pearls 'round my wife's neck. Ain't she supposed to wear no pearls? Somebody tell me--tell me,

who decides which women is supposed to wear pearls in this world.  I tell you I am a man--and I think my wife should wear some pearls in the world."  In *The Good Earth*, a novel by Nobel Prize-winning author Pearl S. Buck, the protagonist's wife, O-Lan has only one request of her husband after a lifetime of toil and labor—to keep a pair of pearls from the stash of hidden jewels she had uncovered:

> And he was moved by something he did not understand and he pulled the jewels from his bosom and unwrapped them and handed them to her in silence, and she searched among the glittering colours, her hard brown hand turning over the stones delicately and lingeringly until she found the two smooth white pearls, and these she took and tying up the others again, she gave them back to him.  Then she took the pearls and she tore a bit of the corner of her coat away and wrapped them and hid them between her breasts and was comforted.

2.      Having been an avid reader as a child, Plaintiff came to look upon pearls as the ultimate material embodiments of love and affection.  Pearls were Plaintiff's first luxury purchase after graduating from law school, when he bought a pearl necklace for his mother from Mikimoto in Hong Kong, for approximately US $5,000 in 1998.  Plaintiff would go on to purchase many pearls as gifts for family and friends in the years that followed, also from Mikimoto. Each gift was a token of affection that was backed by Plaintiff's belief that he was buying a quality gem.

3.      Little did Plaintiff know that it was all a lie. He did not know that, notwithstanding Mikimoto's carefully cultivated reputation for excellence, the nacre in Mikimoto pearls is uncommonly thin and thus particularly vulnerable to wear, leading to the pearls' premature deterioration.[1] Plaintiff also did not know that, when customers buy a large Mikimoto pearl, they are paying a premium price not for a thicker layer of nacre but rather for a large-diameter bead with no intrinsic value.

---

[1] "Nacre" refers to the layers of lustrous white coating generated by mollusks that make pearls attractive and valuable.

4.      In John Steinbeck's *The Pearl*, the protagonist Kino discovers the greatest pearl in the world, which consisted almost entirely of naturally formed nacre:

> Kino lifted the flesh, and there it lay, the great pearl, perfect as the moon. It captured the light and refined it and gave it back in silver incandescence. It was as large as a sea-gull's egg. It was the greatest pearl in the world... . And to Kino the secret melody of the pearl broke clear and beautiful, rich and warm and lovely, glowing and gloating and triumphant. In the surface of the great pearl he could see dream forms.

5.      In contrast, Mikimoto's cultured pearls are only approximately 5% nacre.  Consumers believe they are buying the rich, warm melodies of a pearl, but, in reality, almost 95% of their purchase consists of the bead used to "seed" mollusks rather than the nacre material that makes up naturally occurring pearls. There are no dreams or melodies being formed on the surface of Mikimoto's pearls, just a wasted extravagance. Jesus said, "Give not that which is holy unto the dogs, neither cast ye your pearls before swine." Matthew 7:6. But notwithstanding their premium price, Mikimoto pearls are valueless and appropriately cast before swine.

6.      Plaintiff brings this consumer protection action seeking compensation and injunctive relief for Mikimoto's unfair and deceptive marketing of its cultured pearls. Mikimoto represents its pearls to consumers as top-of-the-line products by promoting its founder's status as the originator of cultured pearls.  However, Mikimoto's cultured pearls fall short of industry standards.

7.      As detailed below, the unacceptably poor quality of Mikimoto pearls is the result of financial incentives that have led Mikimoto to cut short the amount of time its pearls spend growing in mollusks. The result is pearls with paper-thin nacre that is easily worn off, leaving only the worthless beads used to seed the pearls in mollusks, in accordance with artificial pearl culturing methods.

8.    Although Plaintiff hesitates to contradict the Bible, Mikimoto pearls are not even fit for Ms. Piggie, who has higher aesthetic standards:



9.    Plaintiff brings this proposed consumer class action on behalf of himself and all other persons who, from the applicable limitations period up to and including the present (the "Class Period"), purchased Mikimoto pearls ("the Products") for consumption and not resale.

10.    Plaintiff and Class members viewed Defendant's misleading representations and, in reliance thereon, were led to purchase the Products on the understanding that they were top-quality pearls with a substantial amount of nacre.  Plaintiff and Class members were thereby deceived into purchasing an inferior product at a price they would not have been prepared to pay had they known the truth.

11.    Defendant's labeling of the Products violates the consumer protection laws of New York State as well as those of the other forty-nine states and the District of Columbia:

1) Alabama Deceptive Trade Practices Act, Ala. Statues Ann. §§ 8-19-1, *et seq.;*
2) Alaska Unfair Trade Practices and Consumer Protection Act, Ak. Code § 45.50.471, *et seq.;*
3) Arizona Consumer Fraud Act, Arizona Revised Statutes, §§ 44-1521, *et seq.;*
4) Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, *et seq.;*
5) California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.,* and California's Unfair Competition Law, Cal. Bus. & Prof Code § 17200, *et seq.;*
6) Colorado Consumer Protection Act, Colo. Rev. Stat. § 6 - 1-101, *et seq.;*
7) Connecticut Unfair Trade Practices Act, Conn. Gen. Stat § 42-110a, *et seq.;*
8) Delaware Deceptive Trade Practices Act, 6 Del. Code § 2511, *et seq.;*
9) District of Columbia Consumer Protection Procedures Act, D.C. Code § 28 3901, *et seq.;*
10) Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, *et seq.;*
11) Georgia Fair Business Practices Act, § 10-1-390 *et seq.;*
12) Hawaii Unfair and Deceptive Practices Act, Hawaii Revised Statues § 480 1*, et seq.,* and Hawaii Uniform Deceptive Trade Practices Act, Hawaii Revised Statutes § 481A-1, *et seq.;*
13) Idaho Consumer Protection Act, Idaho Code § 48-601, *et seq.;*
14) Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et seq.;*
15) Indiana Deceptive Consumer Sales Act, Indiana Code Ann. §§ 24-5-0.5-0.1, *et seq.;*
16) Iowa Consumer Fraud Act, Iowa Code §§ 714.16, *et seq.;*
17) Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50 626, *et seq.;*
18) Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §§ 367.110, *et seq.,* and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat. Ann §§ 365.020, *et seq.;*
19) Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. § § 51:1401, *et seq.;*
20) Maine Unfair Trade Practices Act, 5 Me. Rev. Stat. § 205A, *et seq.,* and Maine Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. 10, § 1211, *et seq.,*
21) Maryland Consumer Protection Act, Md. Com. Law Code § 13-101, *et seq.;*
22) Massachusetts Unfair and Deceptive Practices Act, Mass. Gen. Laws ch. 93A;
23) Michigan Consumer Protection Act, § § 445.901, *et seq.;*
24) Minnesota Prevention of Consumer Fraud Act, Minn. Stat §§ 325F.68, *et seq.;* and Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.;*
25) Mississippi Consumer Protection Act, Miss. Code Ann. §§ 75-24-1, *et seq.;*
26) Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.;*
27) Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code §30-14-101, *et seq.;*
28) Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59 1601, *et seq.,* and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301, *et seq.;*
29) Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq.;*
30) New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq. ;*
31) New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8 1*, et seq.;*
32) New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57 12 1*, et seq.;*
33) New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law §§ 349, *et seq.;*
34) North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51 15 01, *et seq.;*

*35)* North Carolina Unfair and Deceptive Trade Practices Act, North Carolina General Statutes §§ 75-1, *et seq.;*

*36)* Ohio Deceptive Trade Practices Act, Ohio Rev. Code. Ann. §§ 4165.01. *et seq.;*

*37)* Oklahoma Consumer Protection Act, Okla. Stat. 15 § 751, *et seq.;*

*38)* Oregon Unfair Trade Practices Act, Rev. Stat § 646.605, *et seq.;*

*39)* Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Penn. Stat. Ann. § § 201-1, *et seq.;*

*40)* Rhode Island Unfair Trade Practices And Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.;*

*41)* South Carolina Unfair Trade Practices Act, S.C. Code Laws § 39-5-10, *et seq.;*

*42)* South Dakota's Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws §§ 37 24 *1, et seq.;*

*43)* Tennessee Trade Practices Act, Tennessee Code Annotated §§ 47-25-101, *et seq.;*

*44)* Texas Stat. Ann. §§ 17.41, *et seq.,* Texas Deceptive Trade Practices Act, *et seq.;*

*45)* Utah Unfair Practices Act, Utah Code Ann. §§ 13-5-1, *et seq.;*

*46)* Vermont Consumer Fraud Act, Vt. Stat. Ann. tit.9, § 2451, *et seq.;*

*47)* Virginia Consumer Protection Act, Virginia Code Ann. §§59.1-196, *et seq.;*

*48)* Washington Consumer Fraud Act, Wash. Rev, Code § 19.86.010, *et seq.;*

*49)* West Virginia Consumer Credit and Protection Act, West Virginia Code § 46A-6-101, *et seq.;*

*50)* Wisconsin Deceptive Trade Practices Act, Wis. Stat. §§ 100. 18, *et seq.;*

*51)* Wyoming Consumer Protection Act, Wyoming Stat. Ann. §§40-12-101, *et seq.*

## JURISDICTION AND VENUE

12.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because this is a class action, as defined by 28 U.S.C § 1332(d)(1)(B), in which a member of the putative class is a citizen of a different state than any defendant and the amount in controversy exceeds the sum or value of $5,000,000, excluding interest and costs. *See* 28 U.S.C. § 1332(d)(2).

13.     This court has personal jurisdiction over Defendants because their Products are advertised, marketed, distributed, and sold throughout New York State and because Defendant is headquartered and incorporated in New York State.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (b), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## PARTIES

*Plaintiff*

15.     Plaintiff Lee is, and at all times relevant hereto has been, a citizen of New York and a resident of New York County.

16.     Plaintiff Lee is a long-time lover of pearls who, over the past 25 years, has made more than ten (10) purchases of Mikimoto pearls in New York City (and also other purchases internationally) as gifts for friends and family. He purchased Mikimoto pearls specifically because Mikimoto has represented itself as a top-tier producer of high-quality pearls that are made to last. His most recent purchase in 2019, intended as a gift, was returned to him in 2021 because the nacre had worn through to the bead after only a few years of wear. Plaintiff was spurred by this incident to investigate the quality of Mikimoto Products, and from this he learned that Mikimoto pearls are of poor quality and are not worth the premium price at which they are sold.

17.     Here is an image of the pearl that was returned to Plaintiff:



18.    As can be seen, the nacre of this pearl has completely worn. Only the "seeding" bead remains.

19.    By contrast, here is an image of a similar pearl pendant as advertised by Mikimoto:



20.    The difference is evident, and the reason the pearl purchased by Plaintiff deteriorated so quickly is its thin nacre, as scientifically detailed below.

21.    As a result of Defendant's deceptive conduct as alleged herein, Plaintiff was injured when he paid money for a Product that did not deliver the qualities it promised and misled him as to its contents. Plaintiff would not have been willing to pay the sum he paid for the Product had he known that its qualities had been misrepresented to him. Defendant delivered a Product with significantly less value than was warranted by its representations, thereby depriving Plaintiff of the benefit of his bargain and injuring him in an amount up to the purchase price.

*Defendant*

22.    Defendant MIKIMOTO (AMERICA) CO. LTD. is the American arm of a Japanese corporation that specializes in the production and sale of a variety of cultured pearl products.  It is organized under the laws of New York with a headquarters at 680 Fifth Avenue, 5ᵗʰ Floor, New York, NY 10019.  It's address for service of process is c/o Harold Nathan, 1185 Avenue of the Americas, Suite 3000, New York, NY 10036.

**FACTUAL ALLEGATIONS**

*Mikimoto and the Pearl Industry*

23.    Mikimoto takes its name from its founder, Kokichi Mikimoto, the inventor of the cultured pearl.  The jeweler J.R. Dunn explains Kokichi Mikimoto's seminal contribution:

> The eldest son of a noodle-shop owner, Kokichi Mikimoto was born on January 25, 1858, in Japan's Shima peninsula, in the town of Toba. When he was 11 years old, his father fell ill, and the young boy sought his fortune, bold[ly] interacting with other cultures and exploring new opportunities, as he developed a keen interest in Ise Pearls, natural pearls found in his town, fetching high prices, and being gathered without restraint until they became more scare with each passing year. Mikimoto was concerned about the extinction of the pearl-producing oysters and set out to grow pearls within his own protected oyster beds on Ojima Island.
>
> When Mikimoto learned that Akoya oysters produced the best pearls, he explored methods to introduce a particle into the flesh of the oyster that would stimulate secretions of "nacre" that built up in hundreds of thousands of layers to create a lustrous pearl.
>
> Enormous research efforts, coupled with experimentation, ensued and on July 11, 1893, Mikimoto's wife brought up a basket of oysters from the sea for inspection that showed a cultivated pearl as worthy as a natural one nestled within the folds of an oyster. Three years later, in 1896, Mikimoto was granted his first patent for cultured pearls, and a business was born!
>
> Mikimoto continued to advance the science of pearl cultivation and conquer new challenges in the decades to come. His first pearl boutique opened in Tokyo's Ginza

district in 1899, with stores in London, Paris and other major cities soon following. His products were exhibited, creating many astounding displays that spread the renown of the brand.[2]

24.     Until Mikimoto, the only pearls were natural pearls, which as such were exceedingly rare luxuries available only to the very rich.  But Mikimoto discovered that one can stimulate the growth of a pearl through human intervention, such that it was no longer necessary to wait for an accident of nature to deliver a pearl. Mikimoto initially applied his technique to the Japanese Akoya pearl. But it later became used to cultivate pearls in a range of different mollusks in different parts of the Pacific region, including in Tahiti and China.  It is now also possible to cultivate certain kinds of pearls in fresh water.

25.     The pearl merchant Will Hanigan explains the difference between natural and cultured pearls:

> Natural Pearls form when an irritant - usually a parasite and not the proverbial grain of sand - works its way into an oyster, mussel, or clam. As a defence mechanism, a fluid is used to coat the irritant. Layer upon layer of this coating, called 'nacre', is deposited until a lustrous pearl is formed.
>
> A cultured pearl undergoes the same process. The only difference is that the irritant is a surgically implanted bead or piece of shell called Mother of Pearl. These 'seeds' or 'nuclei' are most often formed from mussel shells. Quality cultured pearls require a sufficient amount of time - generally at least 3 years - for a thick layer of nacre to be deposited, resulting in a beautiful, gem-quality pearl. Lower-quality pearls have often been 'rushed' out of the oyster too quickly (sometimes a year or less) and have a too-thin coat of nacre.
>
> The culturing process usually takes several years. Mussels must reach a mature age, which can take up to 3 years, and only then can be implanted or naturally receive an irritant. Once the irritant is in place, it can take up to another 3 years for the pearl to reach its full size and nacre thickness.  Of the pearls produced, only approximately 5% are of sufficient true gem-quality for top jewellery makers, yet a pearl farmer can figure on spending over $100 for every oyster that is farmed, whether a gem-quality pearl is produced or not.[3]

---

[2] https://jrdunn.com/history-of-mikimoto-pearl-jewelry

[3] https://willhaniganpearls.com/blogs/news/pearl-cultivation

10

26.     Thus, the value of a pearl is substantially affected by the thickness of its nacre, which is the source of pearls' lustrous quality.  The less nacre, the less time it will take for the pearl to lose that luster. As Mikimoto explains: "For nucleated pearls, the thickness of the nacre is often a reliable measure of how long each pearl has been cultured, how long it will last, and its quality. The longer pearls are left to grow, the thicker the nacre."[4]

27.     Unfortunately, the costs and risks of pearl cultivation have in recent years placed financial pressure on some pearl producers to reduce the amount of time a pearl is permitted to remain in the mollusk's shell and accumulate nacre.  Sharon Elain Thompson, a Graduate Gemologist from the Gemological Institute of America and a Fellow of the Gemmological Association of Great Britain, observes:

> Japanese Akoyas once stayed in the water for up to three and a half years to allow the pearl to develop a nacre thickness of up to 1.5 mm. But as water quality decreased—and market pressures increased—the Japanese producers shortened the length of time the oyster spent in the water to as little as six months. That resulted in some very poor quality pearls.[5]

28.     Jewelry historian, author, and lecturer Anna M. Miller observes the same:

> Nacre thickness increases beauty and durability of pearls with the ideal thickness being 1mm.  A three-year growing period has been normal in Japan, but is now decreasing.  The desired size of the pearls and the financial strength of the cultivator to endure waiting periods have determined the years of growth allowed the oyster.[6]

---

[4] https://www.mikimotoamerica.com/us_en/pearl#:~:text=The%20quality%20of%20Mikimoto%20Pearl,the%20same%20species%20of%20mollusks.&text=The%20luster%20of%20the%20pearl,will%20be%20on%20the%20pearl.
[5] https://www.interweave.com/article/jewelry/7-factors-pearl-grading/
[6] Anna M. Miller, *Illustrated Guide to Jewelry Appraising* (GemStone Press Books, 2012), pg. 99

29.    The decline of the Akoya pearl is also confirmed by the jewelry industry expert and

consultant Russell Shor:

> Consumer demand for pearls had revived from a lull in the United States and
> Europe during the 1980s, and was further stimulated by growing Asian economies.
> While prices for akoyas rose strongly as a result, production from Japanese farms
> was actually declining: By 1993, it had fallen to about 35% of 1962 levels. To
> accommodate demand, some producers began rushing their goods to market in as
> little as six months after implantation. Although Japanese akoyas had historically
> been cultivated to a nacre thickness of 1 mm on average, complaints of nacre
> peeling from pearls with coatings less than 0.2 mm thick began to surface, largely
> in Japan (Shor, 1994a).[7]

***Defendant's Unlawful Conduct***

30.    Notwithstanding this trend, Defendant represents itself to the public as hewing

tightly to traditional standards of pearl quality control.  Mikimoto's website states:

### The most luminous of all, "Mikimoto Pearl"

The quality of a pearl is determined by several criteria, including its size, shape,
color, and luster. An important factor to look out for is the thickness of the nacre as
this determines the pearl's luster. Only the Akoya cultured pearls with the highest
quality and luster can be bestowed with the name "Mikimoto Pearl."

### The quality of Mikimoto Pearl

No two pearls would be the same, even if they came from the same ocean or the
same species of mollusks. To maintain the quality of Mikimoto Pearl, we only use
the finest pearls that meet the strictest standards, which are, on average, less than
10 percent of all the pearls we go through. The quality of a pearl is determined by
several criteria, and every Mikimoto Pearl meets them all.[8]

31.    However, Mikimoto's self-aggrandizing representations do not survive scientific

scrutiny. Having observed that the Mikimoto pearls he had gifted in 2019 had completely lost their

---

[7] Russell Shor, *From Single Source to Global Free Market: The Transformation of the Cultured
Pearl Industry*, GEMS & GEMOLOGY, Vol. 43, No. 3, pp. 200–226, 205..
[8] https://www.mikimotoamerica.com/us_en/pearl#:~:text=The%20quality%20of%20Mikimoto%20Pear
l,the%20same%20species%20of%20mollusks.&text=The%20luster%20of%20the%20pearl,will%20b
e%20on%20the%20pearl.

nacre, Plaintiff sent other samples of certain pearls he had also purchased from Defendant for analysis to the Gemological Institute of America (GIA), which reported the pearls' diameter and nacre thickness. *See* **Exhibit A**. These data allow us to calculate nacre as a percentage of the pearls' diameter as well as the sizes of the pearls' nuclei. Results from the two samples are as follows:

|  | Diameter | Nacre Thickness | Nacre as % of Diameter | Nucleus (Diameter – (2 x Nacre Thickness |
|---|---|---|---|---|
| Akoya 1 | 8.31 mm | 0.41 mm | 4.9% | 7.49 mm |
| Akoya 2 | 8.28 mm | 0.56 mm | 6.7% | 7.16 mm |

32.     Plaintiff's Akoya pearls are certainly on the larger side.   The jeweler *purepearls.com* explains that "Akoya pearls range in size form 2.0-3.0mm up through 9.0-9.5mm, and very rarely, 9.5-10.0mm.[9] The jeweler *angara.com* states that the size of Akoya pearls "typically rangers between 3.0mm and 9.5mm."[10]

33.     Notwithstanding their above-average diameter—which would lead one to expect proportionally thicker nacre—the pearls' nacre thickness falls well short of the historical standard of 1-1.5mm, as discussed above. And while industry standards for Akoya pears have deteriorated generally among a number of pearl purveyors, Mikimoto's pearls fall short even by these deteriorated standards, as the nacre thickness does not meet the minimum standards endorsed by jewelers and professional gemologists.

34.     The jeweler *pearlsofjoy.com* observes that "[g]ood quality Akoya pearls should have a nacre thickness of about 10-15% of the diameter of the pearl."[11]   Accordingly, the nacre thickness of Plaintiff's Akoya pearls should be at least 0.83-1.25mm. But it is, in fact, well below

---

[9] https://www.purepearls.com/pages/pearl-types
[10] https://www.angara.com/blog/akoya-vs-south-sea-which-pearl-should-you-choose/
[11] https://www.pearlsofjoy.com/pages/pearl-value-factors#:~:text=The%206%20Cultured%20Pearl%20Quality,%2C%20Shape%2C%20Color%20and%20Size

that, only 0.41mm and 0.56mm. This defectiveness is confirmed by the scientific literature. Researcher Gunawan Muhammad and his colleagues observe:

> The thickness of nacre tablets piling up around the nucleus surface and the monthly growth rate of nacre itself will result in the whole nacre thickness of pearl nacre. Wada (1991) stated that cultured pearls should at least have nacre as thick as one-tenth of the total pearl diameter. For instance, if a pearl is 5 mm in total diameter, the nacre should at least 0.5 mm thick. Hence, whole nacre thickness also affects the quality of pearls.[12]

35.     Mikimoto extracts a premium price from consumers for what seem like large pearls. But these pearls are larger only because Mikimoto uses a larger *bead*. Rather than nucleating its mollusks with a smaller bead and waiting for a substantial layer of nacre to accumulate, Mikimoto creates the illusion of such by using larger beads that need less nacre to grow into pearls of the desired size. These pearls can then be harvested quickly and sold at a premium to unsuspecting consumers who will learn the truth only much later. This is how Mikimoto reduces costs while increasing revenue.

36.     Of course, some consumers may simply prefer to purchase lower-grade pearls at a discounted price, and there is nothing unlawful about catering to this market. But Mikimoto does not, in fact, cater to this market. On the contrary, it presents itself to consumers as a top-tier pearl producer and prices its pearls accordingly. Below is an advertisement by the jewelry retailer Pearl Oasis:

---

[12] Muhammad, Gunawan & Atsumi, Takashi & Sunardi, Sunardi & Komaru, Akira. (2017). *Nacre growth and thickness of Akoya pearls from Japanese and Hybrid Pinctada fucata in response to the aquaculture temperature condition in Ago Bay, Japan*. Aquaculture. 477. 10.1016/j.aquaculture.2017.04.032, pg. 36.



37.      Here is an advertisement for a similar product from Mikimoto:

# MIKIMOTO



Home › Jewelry › Pearl Types › Akoya

M Collection

## M Collection Akoya Cultured Pearl Pendant in 18K Yellow Gold

$2,500.00                    MPQ10152AXXK

This striking collection is an inspiring take on t...
VIEW MORE

♡ ADD TO WISH LIST

ADD TO BAG

38.     The Mikimoto necklace is being sold at over 25x the price of the Pearl Oasis necklace. The Mikimoto necklace is 18k gold whereas the Pearl Oasis pearl is 14k gold, but this small difference alone could never explain the massive price difference.  While Mikimoto does not disclose the size of its pearl, Pearl Oasis states that its pearl is 8.0 to 8.5 mm in diameter, which, as explained, is on the larger side for Akoya pearls, so it is quite unlikely that the Mikimoto pearl is significantly larger. The only reason consumers are willing to pay Mikimoto prices is their assumption that Mikimoto pearls are top of the line pearls and that Mikimoto does not compromise on quality. Indeed, the very price tag of Mikimoto pearls is an implicit promise of a top-quality pearl with a nacre thickness that exceeds industry standards. But the nacre on Mikimoto pearls in fact falls short of industry standards.

39.     Mikimoto's various claims such as "only the very finest gems are ever used to create Mikimoto jewelry" are not mere puffery, because pearl quality can be scientifically evaluated by objective standards that have been formulated by professional gemologists, as

16

demonstrated by all the quotes in this Complaint. And those objective standards reveal that Mikimoto's pearls do not even meet industry standards (let alone exceed them, as the price tag leads reasonable consumers to believe). Mikimoto's products are subpar notwithstanding Mikimoto's carefully cultivated (and marketed) reputation or the fact that the company's namesake originated the cultured pearl.

40.     As noted, Mikimoto itself has stated that "the thickness of the nacre is often a reliable measure of how long each pearl has been cultured, how long it will last, and its quality."[13] So, Mikimoto cannot now attribute Plaintiff's and Class members' complaints about the premature deterioration of its pearls to Plaintiff's and Class members' subjective preferences or idiosyncratic expectations. The quality of the Products can be evaluated objectively on the basis of their nacre thickness.

41.     Defendant's misleading representations were material to, and were relied upon by, Plaintiff and the Class. These representations would also be material to, and be relied upon by, a reasonable consumer, since reasonable consumers who spend significant sums on jewelry are naturally concerned about the quality of what they are purchasing.

42.     Given Mikimoto's carefully cultivated reputation and prestigious pedigree, Plaintiff and the Class did not know, and had no reason to know, that the Product had subpar nacre and would deteriorate prematurely.

43.     Plaintiff and Class members would not have purchased the Products at the given price had they known the truth about their actual make-up. Because they did not know, they were induced to purchase gems that were inferior to what had been represented to them. They were

---

[13]https://www.mikimotoamerica.com/us_en/pearl#:~:text=The%20quality%20of%20Mikimoto%20Pearl,the%20same%20species%20of%20mollusks.&text=The%20luster%20of%20the%20pearl,will%20be%20on%20the%20pearl.

therefore deprived of the benefit of their bargains, injured in an amount up to the purchase price, to be determined by expert testimony at trial.

44.     Mikimoto will doubtless attempt to blame the victim, arguing that the premature deterioration of Plaintiff's pearls (and those of other Class members) is the result of consumers' neglectful failure to properly maintain the pearls. But Mikimoto cannot credibly argue this when the nacre on its vaunted pearls have been shown to be objectively subpar. Plaintiff and other consumers or wearers of pearls have every incentive to take care of their expensive purchases. Mikimoto, by contrast, has every incentive to cut short the period for nacre to accumulate on pearls and disguise this practice by implanting mollusks with large beads whose volume substitutes for nacre accumulation.

45.     Mikimoto's fraud may go undetected by some consumers who treat their Mikimoto pearls as heirloom gems and wear them only once or twice a year (or in a lifetime) for special occasions such as weddings, baptisms, etc. But consumers who wear their Mikimoto pearls more regularly will have noticed the same problem as Plaintiff. Mikimoto's greed speeds up the culturing process and increases sales volume to the severe detriment of consumers who have spent their hard-earned money on gems that are costume-grade.

## CLASS ACTION ALLEGATIONS

46.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons or entities in the United States who made retail purchases of the Products during the applicable limitations period, and/or such subclasses as the Court may deem appropriate ("the Nationwide Class").

47.     In the alternative, Plaintiff seeks to represent a Class consisting of:

> All persons or entities who made retail purchases of the Products in New York during the applicable limitations period, and/or such subclasses as the Court may deem appropriate ("the New York Class").

48.     The proposed Classes exclude current and former officers and directors of Defendant, members of the immediate families of the officers and directors of Defendant, Defendant's legal representatives, heirs, successors, assigns, any entity in which it has or has had a controlling interest, and the judicial officer to whom this lawsuit is assigned.

49.     Plaintiff reserves the right to revise the Class definition based on facts learned in the course of litigating this matter.

50.     This action is proper for Class treatment under Rules 23(b)(1)(B) and 23(b)(3) of the Federal Rules of Civil Procedure. While the exact number and identities of other Class members are unknown to Plaintiff at this time, Plaintiff is informed and believes that there are many thousands, if not millions, of Class members. Thus, the Class members are so numerous that individual joinder of all Class members is impracticable.

51.     Common questions of law and fact arise from Defendant's conduct described herein. Such questions are common to all Class members and predominate over any questions affecting individual Class members. These include:

    i.   Whether Defendant's representations led Plaintiff and Class members to believe that the Products were top-tier cultured pearls;

   ii.   Whether the Products had subpar nacre thickness as judged by expert gemologists;

  iii.   Whether Defendant's representations led Plaintiff and Class members to pay a higher price for the Products than they would have been willing to pay had they known the actual qualities of the Products.

52.     Plaintiff's claims are typical of those of the Class members because Plaintiff and the other Class members sustained damages arising out of the same wrongful conduct, as detailed herein. Plaintiff and Class members purchased Defendant's Products and sustained similar injuries arising out of Defendant's deceptive marketing. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of Class members and are based on the same legal theories.

53.     Plaintiff will fairly and adequately represent and pursue the interests of Class members. Plaintiff understands the nature of his claims herein, has no disqualifying conditions, and will vigorously represent the interests of Class members. Neither Plaintiff nor Plaintiff's counsel have any interests that conflict with, or are antagonistic to, the interests of Class members.

54.     Plaintiff has retained highly competent and experienced class action attorneys to represent his interests and those of Class members. Plaintiff and Plaintiff's counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiff and counsel are aware of their fiduciary responsibilities to Class members and will diligently discharge those duties by vigorously seeking the maximum possible recovery for them.

55.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by any individual Class member are too small to make it economically feasible for an individual Class member to prosecute a separate action, and it is desirable for judicial efficiency to concentrate the litigation of the claims in this forum. Furthermore, the adjudication of this controversy through a class action will avoid the potentially inconsistent and conflicting adjudications of the claims asserted herein. There will be no difficulty in the management of this action as a class action.

56.     The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(2) are met, as Defendant has acted or refused to act on grounds that are generally applicable to all Class members, thereby making appropriate final injunctive or equitable relief with respect to the Classes as a whole.

57.     The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(3) are met, as questions of law or fact common to the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

58.     The prosecution of separate actions by all Class members would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant.

59.     Defendant's conduct is generally applicable to the Classes as a whole and Plaintiff seeks, *inter alia*, equitable remedies with respect to the Classes as a whole. Defendant's systematic policies and practices make declaratory relief with respect to the Classes as a whole appropriate.

## CAUSES OF ACTION

### COUNT I

### VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
### (DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)

**(brought individually and on behalf of the Nationwide Class in conjunction with the substantively similar consumer protection laws of the other states and the District of Columbia or, alternatively, on behalf of the New York Class)**

60.     Plaintiff realleges and incorporates herein by reference the allegations contained in all preceding paragraphs and further alleges as follows:

61.     NY GBL § 349 provides that "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are . . . unlawful."

62.     Under the NY GBL § 349, it is not necessary to prove justifiable reliance. *See Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (N.Y. App. Div. 2012) ("To the extent that the Appellate Division order imposed a reliance requirement on General Business Law [§] 349 … claims, it was error. Justifiable reliance by the plaintiffs is not an element of the statutory claim." (internal citations omitted)).

63.     Any person who has been injured by reason of any violation of the NY GBL § 349 may bring an action in their own name to enjoin such unlawful acts and practices, an action to recover their actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated the law. The court may award reasonable attorneys' fees to a prevailing plaintiff.

64.     The practices employed by Defendant, whereby it advertises, promotes, and markets its Products as top-tier, durable cultured pearls are deceptive, misleading, and in violation of the NY GBL § 349. These practices are directed at consumers.

65.     Defendant's conduct in employing these unfair and deceptive trade practices is malicious, willful, wanton and outrageous such as to shock the conscience of the community and warrant the imposition of punitive damages.  Given Defendant's expertise in the pearl industry, it was perfectly aware that its marketing is false and misleading.

66.     Defendant's actions impact the public interest because Plaintiff was injured in exactly the same way as millions of others purchasing the Products as a result of Defendant's generalized course of deception.

67.     Defendant's deceptive acts and practices proximately caused Plaintiff and Class members to suffer actual damages in the form of, *inter alia*, monies spent to purchase the Products.

Plaintiff and Class members are entitled to recover compensatory damages, statutory damages, punitive damages, attorneys' fees and costs, and any other relief the Court deems appropriate. Damages can be calculated through expert testimony at trial.

68.     Furthermore, Defendant should be enjoined from representing the Products as top-tier cultured pearls and be required to disclose to consumers of the nacre thickness of each Product it sells.

## COUNT II

### VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350
### (FALSE ADVERTISING LAW)

**(brought individually and on behalf of the Nationwide Class in conjunction with the substantively similar consumer protection laws of the other states and the District of Columbia or, alternatively, on behalf of the New York Class)**

69.     Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs and further alleges as follows:

70.     Defendant has been and/or is engaged in the "conduct of … business, trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 350.

71.     New York Gen. Bus. Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …" N.Y. Gen. Bus. Law § 350-a(1).

72.     Defendant caused to be disseminated throughout New York and the United States, through advertising, marketing and other publications, statements that were untrue and/or misleading.

73.     Defendant's representations about the Products are substantially uniform in content, presentation, and impact upon consumers at large. Consumers purchasing the Products were, and continue to be, exposed to Defendant's material deceptions regardless of where or how they purchased the Products.

74.     Plaintiff and Class members have suffered an injury, including the loss of money or property, as a result of Defendant's false and misleading advertising.

75.     Pursuant to N.Y. Gen. Bus. Law § 350-e, Plaintiff and Class members seek monetary damages (including actual damages and minimum, punitive, or treble and/or statutory damages pursuant to GBL § 350-a(1)), injunctive relief, restitution and disgorgement of all monies obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

## COUNT III

## COMMON LAW FRAUD

**(brought on behalf of the Nationwide Class in conjunction with the substantively similar common law of other states and the District of Columbia or, alternatively on behalf of the New York Class under New York common law)**

76.     Plaintiff realleges and incorporates herein by reference the allegations contained in all preceding paragraphs and further alleges as follows:

77.     Defendant intentionally makes materially false and misleading representations regarding the nature of the Products.

78.     Plaintiff and Class members reasonably relied on Defendant's false and misleading representations. They did not know, and had no reason to know, that the Products included a subpar quantity of nacre.  They would not have purchased the Products at the given price had they known the truth.

79.     Defendant knew and intended that Plaintiff and Class members would rely on their misrepresentations.

80.     Plaintiff and Class members have been injured as a result of Defendant's fraudulent conduct.

81.     Defendants are liable to Plaintiff and Class members for damages sustained as a result of Defendant's fraud.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.   An Order that this action be maintained as a class action, appointing Plaintiff as representative of the Nationwide Class or, in the alternative, the New York Class;

b.   An Order appointing the undersigned attorney as Class Counsel in this action;

c.   Restitution and disgorgement of all amounts obtained by Defendant as a result of its misconduct, together with interest thereon from the date of payment, to the victims of such violations;

d.   All recoverable compensatory and other damages sustained by Plaintiff and Class members;

e.   Actual and/or statutory damages for injuries suffered by Plaintiff and Class members in the maximum amount permitted by applicable law;

f.   An order (i) requiring Defendant to immediately cease its wrongful conduct as set forth in this Complaint; (ii) ordering Defendant to engage in a corrective advertising campaign; and (iii) requiring Defendant to reimburse Plaintiff and

Class members up to the amounts paid for the Products;

g.   Statutory pre-judgment and post-judgment interest on any amounts;

h.   Payment of reasonable attorneys' fees and costs; and

i.   Such other relief as the Court may deem just and proper.


## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, on behalf of herself and all others similarly situated, demand a trial by jury on all questions of fact raised by the Complaint.


Dated: March 7, 2022

Respectfully submitted,


By:   */s/ Rony Guldmann*
       Rony Guldmann, Esq.

**LEE LITIGATION GROUP, PLLC**
Rony Guldmann (RG5323)
148 West 24th Street, Eighth Floor
New York, NY 10011
Tel.: 212-661-0052
Fax: 212-465-1181
rony@leelitigation.com
*Attorneys for Plaintiff and the Class*