UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
C.K. LEE, individually and on behalf of all others
similarly situated,                                     :
                                                        :
                                    *Plaintiff*,        :          22-cv-01923-PAC
                                                        :
                - *against* -                           :
                                                        :          **OPINION & ORDER**
                                                        :
MIKIMOTO (AMERICA) CO. LTD.,                            :
                                                        :
                                    *Defendant*.        :
-------------------------------------------------------------X

Plaintiff C.K. Lee[1] ("Plaintiff," or "Mr. Lee") brings claims on behalf of himself and a

putative nationwide class against Defendant Mikimoto (America) Co. Ltd., ("Defendant") for

alleged misrepresentations regarding Defendant's pearl jewelry ("the Products"), including that

they were made with top-quality pearls with a substantial amount of nacre coating.  Plaintiff seeks

damages and injunctive relief for (1) violations of New York General Business Law ("NY GBL")

§§ 349 and 350 and (2) common law fraud.  Defendant has moved to dismiss the Complaint under

Federal Rule of Civil Procedure 12(b)(6).  For the reasons stated below, Defendant's motion is

**GRANTED**.

## BACKGROUND

The Complaint makes numerous observations which the Court notes.

We learn, for example, that in "literature, pearls have been integral as symbols for the

purity of love and human aspiration."  Compl. ¶ 1, ECF No. 1.  Mr. Lee claims to be "an avid

---

[1]Although not officially appearing *pro se* in this matter, Plaintiff is a founding attorney of the Lee
Litigation Group, who is representing him in this matter.

reader as a child," *id.* ¶ 2, and he quotes extensively from *A Raisin in the Sun*,[2] *The Good Earth*,[3]

*The Pearl*,[4] and the Bible,[5] as if to prove that he read the books quoted.  The relevance of these

---

[2] "[I]n *A Raisin in the Sun*, the frustrated African-American protagonist Walter Younger is fed up with racial inequality and proclaims: 'Yes, I want to hang some real pearls 'round my wife's neck. Ain't she supposed to wear no pearls? Somebody tell me--tell me, who decides which women is supposed to wear pearls in this world. I tell you I am a man--and I think my wife should wear some pearls in the world.'"  Compl. ¶ 1, ECF No. 1.

[3] "In *The Good Earth*, a novel by Nobel Prize- winning author Pearl S. Buck, the protagonist's wife, O-Lan has only one request of her husband after a lifetime of toil and labor—to keep a pair of pearls from the stash of hidden jewels she had uncovered:

> And he was moved by something he did not understand and he pulled the jewels from his bosom and unwrapped them and handed them to her in silence, and she searched among the glittering colours, her hard brown hand turning over the stones delicately and lingeringly until she found the two smooth white pearls, and these she took and tying up the others again, she gave them back to him. Then she took the pearls and she tore a bit of the corner of her coat away and wrapped them and hid them between her breasts and was comforted."

*Id.*

[4] "In John Steinbeck's *The Pearl*, the protagonist Kino discovers the greatest pearl in the world, which consisted almost entirely of naturally formed nacre:

> Kino lifted the flesh, and there it lay, the great pearl, perfect as the moon. It captured the light and refined it and gave it back in silver incandescence. It was as large as a sea-gull's egg. It was the greatest pearl in the world... . And to Kino the secret melody of the pearl broke clear and beautiful, rich and warm and lovely, glowing and gloating and triumphant. In the surface of the great pearl he could see dream forms."

*Id.* ¶ 4.

[5] "There are no dreams or melodies being formed on the surface of Mikimoto's pearls, just a wasted extravagance. Jesus said, 'Give not that which is holy unto the dogs, neither cast ye your pearls before swine.' Matthew 7:6." *Id.* ¶ 5.

excerpts is difficult to ascertain.  Mr. Lee includes a picture of Miss Piggy[6], suggesting that it might be appropriate to cast Defendant's pearls "before swine."  And, Mr. Lee informs that his first pearl purchase was for his mother in 1998, after graduating from law school.  Mr. Lee does not disclose his records from law school.

The Court is perplexed as to why any of these assertions—incorrectly stylized as part of the "nature of the action"—are necessary and relevant to Plaintiff's three consumer fraud claims and should not render his entire Complaint frivolous.  Contrary to what appears to be Plaintiff's preferred method of pleading, the Federal Rules require only a ""*short* and *plain* statement of the claim showing that the pleader is entitled to relief."  *Ashcroft*, 556 U.S. at 678–79 (quoting Rule 8(a)(2)) (emphasis added).  Plaintiff should rely only on necessary case law, facts relevant to the asserted claims, and any applicable procedural or local rules, not American literature, the Bible,

---

[6]



*Id.* ¶ 8.

Mr. Lee's childhood memories, or the Muppets. The Court is not required to sift through unnecessary material to understand or arrive at any potentially meritorious claims.

As actually relevant to the stated claims, Defendant is the American arm of a Japanese corporation specializing in the production and sale of "a variety of cultured pearl products." *Id.* ¶ 22. Mr. Kokichi Mikimoto founded the company over one hundred years ago after pioneering a technique to stimulate an oyster's pearl production by introducing "a particle into the flesh of [an] oyster that would stimulate secretions of 'nacre' that built up in hundreds of thousands of layers" to create a pearl. *Id.* ¶ 23. "'Nacre' refers to the layers of lustrous white coating generated by mollusks that make pearls attractive and valuable." *Id.* ¶ 3 n.1. Natural pearls, by contrast, are created by the same secretion process but "form when an irritant . . . [organically] works its way into an oyster, mussel, or clam." *Id.* ¶ 25. "Quality cultured pearls require a sufficient amount of time – generally at least 3 years – for a thick layer of nacre to be deposited. . . ." *Id.*

The "costs and risks of pearl cultivation" have recently put "financial pressure on some pearl producers to reduce the amount of time a pearl is permitted to remain in the mollusk's shell and accumulate nacre," *id.* ¶ 27, resulting in pearls with a thinner nacre shell. Despite this trend towards low-quality production techniques, Defendant "represents itself to the public as hewing tightly to traditional standards of pearl quality control." *Id.* ¶ 30. Specifically, Defendant's website states:

### The most luminous of all, "Mikimoto Pearl"

> The quality of a pearl is determined by several criteria, including its size, shape, color, and luster. An important factor to look out for is the thickness of the nacre as this determines the pearl's luster. Only the Akoya cultured pearls with the highest quality and luster can be bestowed with the name "Mikimoto Pearl."

**The quality of Mikimoto Pearl**

> No two pearls would be the same, even if they came from the same ocean or the same species of mollusks. To maintain the quality of Mikimoto Pearl, we only use the finest pearls that meet the strictest standards, which are, on average, less than 10 percent of all the pearls we go through. The quality of a pearl is determined by several criteria, and every Mikimoto Pearl meets them all.

*Id.* ¶ 30 ("Luminous Paragraph" and "Quality Paragraph," respectively; collectively, "the Website Paragraphs").

Plaintiff's "most recent" purchase occurred nearly four years ago.  *Id.* ¶ 16.  After the Gift was returned to him allegedly with the nacre worn off, *id.* ¶¶ 17–20, Plaintiff "sent other samples of certain pearls he had also purchased from Defendant[7] for analysis to the Gemological Institute of America (GIA), which reported the pearls' diameter and nacre thickness."  *Id.* ¶ 31.  Results from the two samples show:

|  | Diameter | Nacre Thickness | Nacre as % of Diameter | Nucleus (Diameter – (2 x Nacre Thickness |
|---|---|---|---|---|
| Akoya 1 | 8.31 mm | 0.41 mm | 4.9% | 7.49 mm |
| Akoya 2 | 8.28 mm | 0.56 mm | 6.7% | 7.16 mm |

*Id.*; *see also* Compl. Ex. A.

The Products—while being "above-average" in diameter—possess a nacre thickness that falls "well short of the historical standard of 1-1.5mm" and the "minimum standards endorsed by jewelers and professional gemologists," such as a nacre thickness of 10-15% of the pearl's diameter.  *Id.* ¶¶ 33, 34.  The nacre coating of Plaintiff's Akoya pearls "should be at least 0.83-

---

[7] The Complaint does not state when these tested Products were purchased, what condition they were in, or who else may have handled or possessed them prior to testing.

1.25mm" but is in fact "well below that" at "only 0.41mm and 0.56mm." *Id.* ¶ 34. In other words,

Plaintiff claims that Defendant's pearls derive their larger size not from a thicker coating of nacre,

but from a larger seed bead. *Id.* ¶ 35. A comparison of a competitor product:



*id.* ¶ 36, with a "similar" Product from Defendant:



id. ¶ 37, shows that the Products are "being sold at over 25x the price." *Id.* ¶ 38.  And while the

two products differ in gold quality and pearl size, these "small difference[s] alone could never

explain the price difference."  *Id.*  Rather, the "only reason consumers are willing to pay

[Defendant's] prices is their assumption that [the Products] are top of the line pearls and that

[Defendant] does not compromise on quality."  *Id.* ¶ 38.

Plaintiff proposes a multi-state class comprised of all persons who made retail purchases

of the Products, or in the alternative all persons who made retail purchases of the Products in New

York during the applicable limitations period.  *Id.* ¶¶ 46, 47.  Plaintiff and proposed class members

"viewed Defendant's misleading representations and, in reliance thereon, were led to purchase the

Products on the understanding that they were top-quality pearls with a substantial amount of

nacre."  *Id.* ¶ 10.  They would not have purchased the Products had they known the truth.  *Id.*

**DISCUSSION**

I.     **Legal Standard**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   The plaintiff's factual allegations must "raise a right to relief above the speculative level" to cross "the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 570.   "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663.   Although the Court must accept the plaintiff's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).   In deciding a motion to dismiss, the court may consider both "the allegations on the face of the complaint" and "[d]ocuments that are attached to the complaint or incorporated in it by reference." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).

II. **Counts I and II: NY GBL Sections 349 and 350**

Article 22-A of New York's General Business Law protects consumers from deceptive acts and practices.   While Section 349 involves unlawful deceptive acts and practices and Section 350, unlawful false advertising, the standard for recovery under both is "identical" and courts typically merge its analysis of the two claims. *Cosgrove v. Oregon Chai, Inc.*, 520 F. Supp. 3d 562, 575 (S.D.N.Y. 2021) (quoting *Goshen v. Mut. Life Ins. Co. of N.Y.*, 774 N.E.2d 1190, 1195 n.1 (N.Y. 2002)).   "[T]o state a claim under sections 349 or 350, 'a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct, that is (2) materially misleading, and that (3) the plaintiff suffered injury as a result of the allegedly deceptive act or practice.'" *Plavin v. Grp. Health Inc.*, 146 N.E.3d 1164, 1168 (N.Y. 2020) (*quoting Koch v. Acker, Merrall & Condit*

8

*Co.*, 967 N.E.2d 675 (N.Y. 2012)).  Defendant raises two arguments relevant to Plaintiff's NY

GBL claims: (i) that Plaintiff has not adequately alleged that any alleged misrepresentation caused

his injury and (ii) that any statements and omissions are not materially misleading.

A.  Relevant Statements

The parties refer in their motions to: (1) the Luminous Paragraph, and specifically the

phrases "the most luminous of all" and the "highest quality and luster," Compl. ¶ 30; (2) the

Quality Paragraph, and specifically the phrase "the finest pearls that meet the strictest standards"

*id.*; (3) the statement "the thickness of the nacre is often a reliable measure of how long each pearl

has been cultured, how long it will last, and its quality", *id.* ¶ 40; and (4) "an advertisement by the

jewelry retailer Pearl Oasis," *id.* ¶ 36, contrasted with "a similar product" from Defendant, *id.* ¶

37.  The Court thus similarly limits itself to the above representations in its analysis.

B.  Alleged Injury

Plaintiff asserts that Defendant's alleged misrepresentations caused his injuries.  To plead

an injury pursuant to either Section 349 or 350, "a plaintiff must allege that, on account of a

materially misleading practice, [he] purchased a product and did not receive the full value of [his]

purchase."  *Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (2d Cir. 2015).  Under the price premium

theory, a plaintiff can show injury by alleging an overpayment, whereby the plaintiff paid more

than he would have but for the deceptive practice.  *Duran v. Henekl of Am., Inc.*, 450 F. Supp. 3d

337, 350 (S.D.N.Y. 2020) (cleaned up).  However, "a plaintiff must allege not only that [the]

defendants charged a price premium, but also that there is a connection between the

misrepresentation and any harm from, or failure of, the product."  *Id.*  Although a plaintiff need

not show that he relied upon the defendant's misrepresentations, he "must state in his complaint

that he has seen the misleading statements of which he complains before he came into possession

of the products he purchased." *Oden v. Boston Scientific Corp.*, 330 F. Supp. 3d 877, 902 (E.D.N.Y. 2018) (internal quotations omitted).

Plaintiff argues that he adequately demonstrated injury because he alleged a difference between the value of the Products as represented and as sold.  Compl. ¶ 3, Pl.'s Opp'n at 16.  The Court agrees.  *See, e.g.*, *Duran*, 450 F. Supp. 3d at 350.  Defendant's argument though was not that Plaintiff failed to assert a cognizable injury, but that he failed to sufficiently demonstrate that its alleged misrepresentation *caused* his injury, *i.e.*, that Plaintiff fails to assert that he ever saw or was exposed to Defendant's statements.  The Complaint, however, does claim that "Plaintiff and class members viewed Defendant's misleading representations and, in reliance thereon, were led to purchase the Products on the understanding that they were top-quality pearls with a substantial amount of nacre."  Compl. ¶ 10.  Because a plaintiff is not required to meet Rule 9(b)'s heightened pleading requirements for Section 349 and 350 claims, *Cosgrove*, 520 F. Supp. 3d at 575–76, the Court accepts this representation as true and draws the reasonable inference that Plaintiff's use of "misleading representations" refers to the statements and images addressed in his Complaint.  *Cf. Lugones v. Pete & Gerry's Organic, LLC*, 440 F. Supp. 3d 226, 240 (S.D.N.Y. 2020) (dismissing NY GBL § 349 claim where "[p]laintiffs allege that they checked Defendant's website, but . . . d[id] not allege that they viewed [the representation] prior to purchasing [the product]").  Plaintiff has therefore adequately alleged that Defendant's misrepresentations caused his injury.

C.  Alleged Misrepresentations

A deceptive act, practice, or advertisement is materially misleading if it is "likely to mislead a reasonable consumer acting reasonably under the circumstances."  *Orlander*, 802 F.3d at 300 (internal quotations omitted).  Courts view statements and labels not in isolation but consider "each allegedly misleading statement in light of its context on the product label or advertisement

as a whole." *Pichardo v. Only What You Need, Inc.*, 20-CV-493 (VEC), 2020 WL 6323775, at *2 (S.D.N.Y. Oct. 27, 2020) (internal quotations omitted). Although a plaintiff need not meet Rule 9(b)'s heightened pleading requirements, he "must do more than plausibly allege that a 'label might conceivably be misunderstood by some few consumers.'" *Twohig v. Shop-Rite Supermarkets, Inc.*, 519 F. Supp. 3d 154, 160 (S.D.N.Y. 2021) (quoting *Sarr v. BEF Foods, Inc.*, No. 18-CV-6409, 2020 WL 729883, at *3 (E.D.N.Y. Feb. 13, 2020) (internal quotation marks omitted)). A plaintiff must "plausibly allege that a significant portion of the general consuming public or of targeted customers, acting reasonably in the circumstances, could be misled." *Id.* (quotation marks omitted). "It is well settled that a court may determine as a matter of law that an allegedly deceptive advertisement would not have misled a reasonable consumer." *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013).

Defendant first alleges that the Website Paragraphs' descriptions of the Products as "the finest," "the most luminous of all," and "the highest quality" are all non-actionable puffery. The Court agrees. "Statements that are mere puffery cannot support a claim under GBL §§ 349 or 350, and thus '[c]ourts can determine that a statement is puffery as a matter of law.'" *Duran*, 450 F. Supp. 3d at 346–47 (quoting *Lugones*, 440 F. Supp. 3d at 241). Puffery includes generalized or exaggerated statements which a reasonable consumer would not interpret as a factual claim upon which he could rely. *Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 528 n.14 (S.D.N.Y. 2003). All three phrases are "[s]ubjective claims about products, which cannot be proven either true or false," *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 159 (2d Cir. 2007), and therefore fail as a matter of law. *See also Bergeron v. Rochester Inst. of Tech.*, 20-CV-6283 (CJS), 2023 WL 1767157, at *9 (W.D.N.Y. Feb. 3, 2023) (finding "finest laboratories, technology and computing facilities available" constitute puffery); *Lin v. Canada Goose US, Inc.*, --- F. Supp. 3d

11

---, ---, 2022 WL 16926312, at *5 (S.D.N.Y. Nov. 14, 2022) (concluding that "highest quality" is nonactionable puffery).

Plaintiff concedes that many of Defendant's representations may seem like "mere puffery" when taken in isolation. Pl.'s Opp'n at 4. He instead argues that the overall context of the Website Paragraphs, specifically Defendant's statement that the Products "meet the strictest standards", are not puffery and would mislead a reasonable consumer into inferring that the Products have at least 1 mm of nacre coating. The Court disagrees—the statement "meet the strictest standards" is itself puffery. "General statements about compliance with safety and quality standards are non-actionable 'puffery' where, as here, they fail to identify specific requirements or standards." *Leonard v. Abbott Labs., Inc.*, No. 10-CV-4676 (ADS) (WDW), 2012 WL 764199, at *22 (E.D.N.Y. Mar. 5, 2012). The vagueness of Defendant's "strictest standard" reference is particularly noticeable when compared with one of its competitors, who advertise themselves as using "the cultured pearl grading standards provided by the Gemological Institute of America." Compl. ¶ 36.

Perhaps sensing this weakness, Plaintiff confusingly introduces the words "scientifically" and "traditional" in his analysis of the Website Paragraphs. *See, e.g.*, Compl ¶ 30 ("Defendant represents itself to the public as hewing tightly to traditional standards of pearl quality control); Pl.'s Opp'n at 4 ("[A] reasonable consumer would gather . . . that [the Products], *at a minimum*, meet scientifically established standards for pearl quality." (emphasis in original)). But the Complaint does not allege a single statement in which Defendant says it follows a "traditional" or "scientific" standard nor does it cite to any representation of the Defendant where the Defendant refers even in broad terms to its history or pearl-cultivating tradition. Rather, the Complaint's references to Defendant's innovation in pearl culturation and "traditional" cultured pearl standards

are exclusively from third-party sources. *See* Compl. ¶¶ 23–29. This is insufficient to support a

claim under Sections 349 or 350. *See, e.g.*, *Brady v. Basic Research, LLC*, 101 F. Supp. 3d 217,

236-37 (E.D.N.Y. 2017) (dismissing Section 349 claim when "the [product's] packaging in the

[complaint] does not represent that the product is safe, and cannot, therefore amount to material

misrepresentation as a matter of law."); *Plavin*, 146 N.E.3d at 1168 ("[A] plaintiff must allege that

a *defendant* has engaged in" deceptive conduct. (emphasis added)).

Plaintiff's request that the Court consider the "overall impression generated by Defendant's

various representations" does not salvage his claim. Pl.'s Opp'n at 9. For one, "common sense

dictates that a necessary prerequisite to viewing" each allegedly misleading statement in context

"is the existence of a misleading statement, which again, Plaintiff has not identified." *Gordon v.

Target Corp.*, No. 20-CV-9589 (KMK), 2022 WL 836773, at *11 (S.D.N.Y. Mar. 18, 2022).

Further, Plaintiff is correct that "[c]ourts view each allegedly misleading statement in light of its

context on the product label or advertisement as a whole." *Pichardo*, 2020 WL 6323775, at *2.

However, the Website Paragraphs plainly do not themselves refer to Defendant's tradition or

history nor does the Complaint allege that Defendant itself otherwise boasts of its tradition or

history, in any label, advertisement, or generally on its website. In other words, Plaintiff fails to

provide the Court with any of Defendant's statements that it could use to contextualize the phrase

"strictest standards" as implying an adherence to traditional or minimum pearl cultivation

standards.

The only additional statement in the Complaint attributed directly to the Defendant is that

"for nucleated pearls, the thickness of the nacre is often a reliable measure of how long each pearl

has been cultured, how long it will last, and its quality. The longer pearls are left to grow, the

thicker the nacre." *Id.* ¶ 26. Again, this statement does not refer to a specified standard or even

uses the words "history", "tradition", or "scientific."  Nor does Plaintiff claim this statement itself

is false.  "[A] party does not violate General Business Law § 349 by simply publishing truthful

information and allowing consumers to make their own assumptions about the nature of the

information."  *Gomez–Jimenez v. New York Law School*, 956 N.Y.S.2d 54, 59 (1st Dep't 2012),

*leave to appeal denied* 20 N.Y.3d 1093 (N.Y. 2013).  In sum, no reasonable consumer would be

misled to believe that the statement "meet the strictest standard," without more, implies a minimum

nacre thickness.

Plaintiff's claim separately fails even had he included citations to Defendant's statements

regarding its history and tradition.  Plaintiff argues that a reasonable consumer would understand

the reference to "standard" or "tradition" to refer to a minimum nacre thickness based on excerpts

from other jewelry retailers, a "pearl merchant," several articles from highly specialized journals

relating to jewelry appraisal, and pearl jewelry blogs.  Only a handful of the cited sources refer

specifically to Defendant's Products and even fewer appear to even be broadly directly at

consumers as opposed to appraisers, historians, or—in Plaintiff's own words—"professional

gemologists."  Compl. ¶ 33.  Plaintiff fails to make a single allegation with "respect to the

distribution or readership or these articles and blogs in order to connect them to the understanding

of the reasonable consumer."  *Lee v. Mondelez Int'l, Inc.*, --- F. Supp. 3d ---, ---, 2022 WL

16555586, at *13 (S.D.N.Y. Oct. 28, 2022).[8]  Courts have repeatedly rejected that reasonable

consumers are even aware of specialized standards, let alone that they rely on them in their day-

---

[8] The Court notes that *Lee* was also brought by Mr. Lee and the Lee Litigation Group.  *See Lee v. Mondelez Int'l, Inc.*, --- F. Supp. 3d ---, ---, 2022 WL 16555586, at *1 (S.D.N.Y. Oct. 28, 2022).  Although Judge Liman's decision in *Lee* was issued after the briefing for the instant motion closed, Mr. Lee should now consider himself sufficiently on notice that the Court will not accept conclusory allegations involving the beliefs of a reasonable consumer premised on unsupported, unrelated sources.

to-day marketplace expectations. *See, e.g.*, *Sibrian v. Cento Fine Foods, Inc.*, 19-CV-0974 (JS) (ST), 2020 WL 3618953, at *4 (E.D.N.Y. July 2, 2020) (rejecting that a reasonable consumer would infer that tomatoes labeled "Certified San Marzano" were harvested and produced pursuant to the Consortium of the San Marzano Tomato's standards); *Lederman v. Hershey Co.*, 2022 WL 3573034, at *4 (N.D. Ill. Aug. 19, 2022) ("[E]ven if the reasonable confectionery expert deems milkfat essential to fudge, Plaintiff has not shown that the reasonable 21st century consumer has the same expectations."). Plaintiff does not make a single allegation as to why the Court should consider his sources representative of the reasonable beliefs of a reasonable consumer.

Even if the Court were to consider Plaintiff's purported experts as representing the purchasing expectations of a reasonable consumer, one of them (the GIA) awarded the Products with its highest rating. *See* Compl. Ex. A (finding rating nacre as "acceptable"); Pearls of Joy, *Pearl Nacre Quality & Grading*, https://www.pearlsofjoy.com/pages/pearl-nacre (last accessed Mar. 9, 2023) ("If dealing with quality pearls, they should fall into the 'acceptable' category). While Plaintiff is correct that the Court may not make credibility determinations on a motion to dismiss, *see Palin v. New York Times Co.*, 940 F.3d 804, 812 (2d Cir. 2019), it likewise need not feel constrained to accept as true facts "contradicted . . . by documents upon which its pleadings rely." *In re Livent, Inc. v. Noteholders Sec. Lit.*, 151 F.Supp.2d 371, 405–06 (S.D.N.Y. 2001). That one of Plaintiff's own experts does not find the Products' nacre thickness deficient does not doom his claim, but it certainly makes less plausible that a reasonable consumer would expect a nacre thickness exceeding one of his own experts. What Plaintiff ultimately asks is that the Court "draw the highly specific inference", *Cooper v. Anheuser-Busch, LLC*, 553 F. Supp. 3d 83, 95 (S.D.N.Y. 2021), that a reasonable consumer viewing the phrase "strictest standard" would

necessarily infer, without more, that the Products have a nacre thickness of at least 1 mm or 10% of its total diameter.  The Court declines to do so.

Finally, Plaintiff also alleges that Defendant's misrepresentations, combined with the Products "high-end price tag", could mislead a reasonable consumer into thinking Defendant adheres to "scientifically established standards of nacre thickness."  Pl.'s Opp'n at 10.  Plaintiff's reliance on non-binding price differential cases is also misplaced.  As noted above, Plaintiff fails to plausibly allege that Defendant's statements were deceptive; any price differential theory is therefore unavailable.  *See Lokey v. CVS Pharm., Inc.*, 20-cv-04782-LB, 2020 WL 6822890, at *4 (N.D. Cal. Nov. 20, 2020) ("[A] merchant's decision to charge different prices is not justiciable unless there is some other deception.").  Plaintiff's Section 349 and 350 claims based on misrepresentation are therefore dismissed.[9]

D.  Alleged Omissions

Plaintiff also asserts that Defendant's failure to disclose the Products' subpar nacre thickness is a deceptive practice.  Under Sections 349 and 350, an "omission is materially misleading, for example, where the plaintiff would have acted differently had the defendant disclosed the information in its possession."  *Braynina v. TJX Comp., Inc.*, 15 Civ. 5897 (KPF), 2016 WL 5374134, at *5 (S.D.N.Y. Sept. 26, 2016).  A business is not required to "ascertain consumers' individual needs and guarantee that each consumer has all relevant information specific to its scenario."  *Id.*  Rather, "a plaintiff can only state a claim for omission under the GBL

---

[9] Plaintiff's consumer fraud claims under the other 50 fraud statutes fail for the same reason.  *See In re 100% Grated Parmesan Cheese Mktg. & Sales Practice Lit.*, 275 F. Supp. 3d 910, 920 (N.D. Ill. 2017) (noting state consumer fraud statutes all require a plaintiff to "allege conduct that plausibly could deceive a reasonable consumer").

'where the business alone possesses material information that is relevant to the consumer and fails to provide this information." *Gordon*, 2022 WL 836773, at *10.

Plaintiff raises his omission theory, however, for the first time in his opposition to Defendant's motion to dismiss.  "It is well-settled that a plaintiff 'cannot amend [his] complaint by asserting new facts or theories for the first time in opposition to [a] motion to dismiss.'" *Peacock v. Suffolk Bus Corp.*, 100 F. Supp. 3d 225, 231 (E.D.N.Y. 2015) (quoting *K.D. v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 209 n.8) (S.D.N.Y. 2013)).  The Court is particularly disinclined to address any alleged omission in the instant order when the Complaint does not contain facts related to whether Defendant alone possessed the relevant information and failed to provide it or whether Plaintiff was unable to "reasonably obtain" unlisted product information. *See, e.g.*, *Dimond v. Darden Restaurants, Inc.*, No. 13 Civ. 5244 (KPF), 2014 WL 3377105, at *14 (S.D.N.Y. July 9, 2014) (finding plaintiff was "entirely capable of obtaining the omitted beverage prices" by merely inquiring of the defendant-restaurants as to the price absent any indication defendants otherwise concealed the prices).  Plaintiff's Sections 349 and 350 claims based on omission are therefore dismissed.

### III.  Count III:  Fraud

"Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *DeRaffele v. Williams & Williams*, 21-CV-06033 (PMH), 2023 WL 2058611, at *3 (S.D.N.Y. Feb. 16, 2023).[10]  A plaintiff must comply with

---

[10] Both parties presume in their briefing that New York law governs Plaintiff's fraud claim. "[S]uch 'implied consent' suffices 'to establish choice of law.'" *GateGuard, Inc. v. Amazon.com Inc.*, 21-

Federal Rule of Civil Procedure 9(b)'s heightened pleading standard and "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rostami v. Open Props, Inc.*, No. 22-CV-3326 (RA), 2023 WL 137748, at *3 (S.D.N.Y. Jan. 9, 2023) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006)). A plaintiff must also "allege facts that give rise to a strong inference of fraudulent intent." *Id.* (internal quotations omitted). This inference "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner*, 459 F.3d at 290–91.

Plaintiff fails to properly plead a common law fraud claim because he does not adequately allege that Defendants acted with fraudulent intent. Plaintiff claims that Defendant acted with fraudulent intent as evidenced by Defendant's "broad interest in maximizing profits" and because Defendant's "well-known expertise in the pearl business makes it eminently plausible that Defendant knew (1) the actual nacre thickness of its pearls' nacre and (2) that this thickness fell short by scientifically established standards." Pl.'s Opp'n at 18. Both augments fail. "The simple knowledge that a statement is false is not sufficient to establish fraudulent intent, nor is a defendants' generalized motive to satisfy consumers' desires or increase sales or profits." *Davis v. Hain Celestial Grp., Inc.*, 297 F. Supp. 3d 327, 337 (E.D.N.Y. 2018) (cleaned up).[11] Plaintiff's fraud claim is dismissed.

---

cv-9321 (JGK), 2023 WL 2051739 at *8 (S.D.N.Y. Feb. 16, 2023) (quoting *Krumme v. Westpoint Stevens*, 238 F.3d 133, 138 (2d Cir. 2000)).

[11] Plaintiff's claim fails for the alternative reason that puffery "will not support a common law fraud claim." *Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 347 n.4 (S.D.N.Y. 2020).

**IV.**   **Standing to Seek Injunctive Relief**

Plaintiff also seeks injunctive relief in the form of directing Defendant to correct its allegedly misleading representations.  As his causes of action are dismissed, Plaintiff's request for injunctive relief is similarly dismissed.  *See Catala v. Joombas Co.*, 18 Civ. 8401 (PGG), 2019 WL 4803990, at *6 n.10 (S.D.N.Y. Sept. 23, 2019) *reconsideration denied*, 2021 WL 2012379 ("[I]t is well settled that a request for . . . injunctive relief is not an independent cause of action." (alteration in original)).

Plaintiff's request alternatively fails because he lacks standing to seek injunctive relief.  "A plaintiff seeking to represent a class must personally have standing." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016). "Although past injuries may provide a basis for standing to seek money damages, they do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that [he] is likely to be harmed again in the future in a similar way." *Id.*  "In a deceptive business practices action under GBL §§ 349 and 350, the Second Circuit has determined that absent an intent to purchase the offending product in the future, a plaintiff lacks standing to seek injunctive relief." *Yee Ting Lau v. Pret A Manger (USA) Ltd.*, No. 17 Civ. 5775 (LAK), 2018 WL 4682014, at *2 (S.D.N.Y. Sept. 28, 2018) (cleaned up).

Plaintiff has not plausibly alleged a threat of future injury.  He claims that he might purchase the Products if "Defendant recognizes the error of its ways and begins cultivating pearls with adequate nacre thickness." Pl.'s Opp'n at 19.  However, "[a]lleging that one would purchase a product if re-engineered or re-marketed does not show a real or immediate threat of future injury." *Duran*, 450 F. Supp. 3d at 356.  To the extent Plaintiff relies on the logic of *Ackerman v. Coca–Cola Co.*, No. 09 Civ. 395, 2013 WL 7044866, at *15 n.23 (E.D.N.Y. July 18, 2013), and its progeny, courts in this Circuit have repeatedly rejected that plaintiffs face a real threat of future

economic harm "as long as the status quo persists." *Yee Ting Lau*, 2018 WL 4682014, at *2; *see also Silva v. Hornell Brewing Co.*, No. 20 Civ. 756 (ARR) (PL), 2020 WL 4586394, at *7 (E.D.N.Y. Aug. 10, 2020) (finding that *Ackerman* and *Belfiore v. P&G*, 94 F. Supp. 3d 440, 445 (E.D.N.Y. 2015) are "inconsistent with Article III and with Supreme Court and Second Circuit case law").

## CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendant's motion to dismiss the Complaint. Although Defendant requests that the Complaint be dismissed with prejudice, Federal Rule of Civil Procedure 15(a) provides that courts "should freely give leave when justice so requires." The Court is far from convinced that justice so requires here. However, out of an abundance of caution, the Court will allow Plaintiff 21 days to file an Amended Complaint, should he so desire. The Clerk of Court is respectfully directed to close the motion at ECF No. 13.

Dated: New York, New York  
      March 30, 2023

SO ORDERED

HONORABLE PAUL A. CROTTY  
United States District Judge